## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

ROBIN MCNEIL and LILLIAN
MARSHALL on behalf of themselves
and all others similarly situated,

      Plaintiffs,

         v.

SELENE FINANCE, LP, SOUTHWEST
BUSINESS CORPORATION, and
GREAT AMERICAN E&S INSURANCE
COMPANY

      Defendants.

_____/

**CLASS ACTION COMPLAINT**
**JURY DEMAND**

### CLASS ACTION COMPLAINT

Plaintiffs Lillian Marshall and Robin McNeil file this class action complaint, on behalf of themselves and all others similarly situated, against Defendants Selene Finance, LP ("Selene"), Southwest Business Corporation ("Southwest"), and Great American E&S Insurance Company ("Great American") (collectively, "Defendants").

### INTRODUCTION

1.      This action seeks to redress for injuries resulting directly from Defendants' force-placed insurance practices.  Plaintiffs and a proposed nationwide class and two subclasses of Selene borrowers seek to recover damages they have suffered as a result of Defendants' wrongful conduct in manipulating the force-placed insurance market through collusive agreements involving kickback arrangements and other forms of improper compensation, and their standard practice of charging borrowers undisclosed and illegitimate costs in connection with force-placed insurance.

2.      Selene was established on Oct. 1, 2007 to service nonperforming and sub-performing residential mortgage loans.  It is an indirect subsidiary of Selene Holdings LLC. Selene functions as a special servicer for the Selene Residential Mortgage Opportunity Fund I and Fund II, which buys distressed assets primarily through whole loan purchases.  In 2012, Selene expanded into servicing prime mortgage loans. Their exclusive and collusive relationships with Great American and Southwest have resulted in extraordinary profits for all the Defendants totaling in the millions of dollars.

3.      During the class period, Selene, Great American, and Southwest have engaged in a pattern of unlawful and unconscionable profiteering and self-dealing in the purchase and placement of force-placed insurance coverage on behalf of Selene borrowers in Florida and throughout the country.

4.      Selene has entered into agreements with Great American and Southwest that give those companies the exclusive right to monitor the entire Selene mortgage loan portfolio for lapses in homeowners' insurance coverage and force-place their own insurance coverage in the event of a lapse.  The new coverage is issued from a master policy that Selene purchases before any individual lapse to cover its entire loan portfolio.  In exchange, Great American and Southwest provide Selene with various kickbacks that Defendants attempt to disguise as legitimate compensation. These kickbacks include but are not limited to one or more of the following: (1) unearned "commissions" paid to Selene or an affiliate for work purportedly performed to procure individual policies; (2) "expense reimbursements" allegedly paid to reimburse Selene for expenses it incurred in the placement of force-placed insurance coverage on homeowners; (3) payments of illusory reinsurance premiums that carry no commensurate transfer of risk; and (4) free or below-cost mortgage-servicing functions that Southwest and Great American perform for Selene that

2

often have nothing to do with the placement of insurance coverage.

5.     Because of these kickbacks, Selene essentially receives a rebate on the cost of the force-placed insurance; however, Selene homeowners ultimately bear the cost of these kickbacks because Selene does not pass on these rebates to the borrower. The charges for force-placed insurance are deducted from borrowers' escrow accounts or added to the balance of their mortgage loans and Defendants attempt to disguise the kickbacks as legitimate by characterizing them as income earned by Selene when, in fact, they are unearned and unlawful profits.

6.     During the proposed class period, Defendants treated Plaintiffs and every putative class member in an identical manner pursuant to their standard policies and procedures by among other things: (1) notifying them that their coverage had lapsed and new coverage had been forced with the same cycle of form letters; (2) forcing coverage for every borrower from one master policy that covered Selene's entire loan portfolio; (3) forcing new coverage in the same manner for every member of the proposed classes; and (4) including the same impermissible costs in the amounts charged every putative class member for coverage.

7.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed classes they seek to represent. This action seeks to redress harm resulting directly from Defendants' force-placed insurance practices.  Plaintiffs do **not** challenge the cost of the forced-place insurance *per se* or the insurance rates that may have been filed by Great American.  Nor do Plaintiffs challenge Selene's contractual right to obtain force-placed insurance to protect its interest in Plaintiffs' loan but instead challenge the manner in which Selene has manipulated the force-placed insurance process whereby Selene receives an effective rebate on the cost of the FPI but does not pass the rebate on to the borrowers.

3

## PARTIES

### Plaintiffs

8.      Plaintiff Lillian Marshall was charged for force-placed insurance on her home in New Jersey by Defendant Selene. Pursuant to its exclusive arrangement with Southwest and Great American, and the master policy in place, and upon information and belief, Selene purchased the force-placed insurance coverage through Southwest and Great American in 2016.  Ms. Marshall is a citizen of the State of New Jersey.

9.      Plaintiff Robin McNeil was charged for force-placed insurance on her home in Florida by Defendant Selene. Pursuant to its exclusive arrangement with Southwest and Great American, and the master policy in place, and upon information and belief, Selene purchased the force-placed insurance coverage through Southwest and Great American in 2015.  Ms. McNeil is a citizen of the State of Florida.

### Defendants

10.      Selene is a Texas company with its principal place of business in Houston, Texas. It is an indirect subsidiary of Selene Holdings, LLC. Selene services residential mortgage loans in Florida, New Jersey, and throughout the United States, including loans within this district.  Selene serviced the Plaintiffs' loans.

11.      Southwest is a Texas company with its principal place of business in San Antonio. It provides insurance, mortgage, and investment services to financial institutions, businesses, and individuals and is licensed to do business in all fifty U.S. states. Southwest contracts with servicers and lenders to act as a force-placed insurance vendor.  During the relevant time periods described in this Complaint, Southwest contracted as a force-placed insurance vendor with Selene.  Upon information and belief, Southwest, along with Great American, tracks loans in Selene's mortgage

4

portfolio, handles customer service duties related to force-place insurance, and issues certificates from the force-placed insurance master policy on properties when a borrower's insurance has lapsed. At all relevant times described in this complaint, Southwest was acting as an agent, servant, employee, partner, and joint venturer of Defendants Selene and Great American. Southwest had actual or constructive knowledge of the acts of each of these Defendants, and ratified, approved, joined in, acquiesced in, or authorized the wrongful acts of each co-defendant, and retained the benefits of said wrongful acts. Southwest was a direct, necessary, and substantial participant in the common course of conduct complained of herein, and was aware of its overall contribution to and furtherance of the conspiracy and common course of conduct. Southwest conducts business throughout the United States, including Florida and New Jersey.

12.     Great American is a Delaware company with its principal place of business in Cincinnati, Ohio. It is a surplus line insurance carrier in Florida, New Jersey, and throughout the country. Surplus line insurance carriers do not file their insurance rates with State insurance regulators and therefore their rates (and the ultimate insurance premiums) are not reviewed or approved by the State insurance regulators.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

14.     Plaintiff Lillian Marshall is a citizen of New Jersey who owns property in New Jersey on which insurance coverage was forced by Defendant Selene through its exclusive arrangements.

15.     Plaintiff Robin McNeil is a citizen of Florida who owns property in Florida on which insurance coverage was forced by Defendant Selene through its exclusive arrangements.

5

16.     Selene is registered to do business in Florida.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

17.     This Court has subject-matter jurisdiction over this action because Plaintiffs' claims arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), according to the statute's jurisdictional statement, 18 U.S.C. § 1964.  Further, pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction based on Plaintiffs' claims for violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

18.     This Court has further jurisdiction over Defendants because they are either foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

19.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and Defendants. 28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d) (2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

20.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

6

21.     All conditions precedent to this action have occurred, been performed, or have been waived.

## NATURE OF THE CASE

22.     All mortgage lenders' and servicers' force-placed insurance schemes operate in a materially similar fashion.  When a homeowner's voluntary insurance policy lapses, the mortgage servicer force-places insurance on the property and charges the borrower more than its actual cost of insurance for the coverage it places.  Lenders and servicers charge borrowers more than their actual cost despite provisions in the mortgage contract and in notice letters sent to borrowers advising that the borrower will be charged for the cost of insurance coverage.  The borrower ultimately pays more than the lender or servicer because after the lender or servicer pays the insurer for the force-placed coverage, the insurer kicks a percentage of the payment back to the servicer or one of its affiliates.  This gratuitous kickback essentially provides the lender or servicer with a rebate on the cost of the insurance coverage.  The benefit of that rebate is not, however, passed on to the borrower.

23.     The amounts that Selene charges borrowers for forced coverage often have little to do with the actual risk insured or the value of the property, and are purely a function of this kickback scheme. This action seeks compensation for borrowers who have been victimized by this practice and an end to this illegal scheme.

24.     At all relevant times, Selene purchased force-placed insurance through Southwest and Great American pursuant to a longstanding agreement whereby Great American furnished insurance coverage for the entire Selene portfolio of mortgage loans under a master policy. Southwest facilitates the arrangement by taking over certain mortgage servicing functions on

7

behalf of Selene at below cost, including tracking the loans in the Selene portfolio for lapses in insurance, and notifying Great American of any lapse so an individual certificate for the particular borrower's property can be issued under the master policy.

25.     This arrangement returns a significant financial benefit to Selene that is unrelated to any contractual or bona fide interest in protecting Selene's interest in the loan.  Pursuant to its agreement, Selene purchases insurance coverage from Great American, and in exchange, Selene receives kickbacks from Great American and Southwest in the form of unearned "commissions," ceded premiums for riskless reinsurance, subsidies for below-cost mortgage servicing functions (that often have nothing to do with providing insurance coverage), or illusory "expense reimbursements," among other things, which amount to a rebate on the cost of the FPI to Selene. Selene then imposes the pre-rebate charges upon borrowers in amounts it claims to represent the cost of the insurance it paid for, but in fact it is a greater amount than Selene paid because the charges include the secret kickbacks and other illicit consideration that is remitted to Selene and that amount to a rebate that Selene did not pass on to its borrowers.

26.     Selene's desire to reap greater profits through its prearranged agreements with Southwest and Great American leads it to select an insurance policy that will allow for kickbacks to Selene. However, Selene subsequently charges its borrowers amounts for coverage that are greater than what Selene ultimately pays for the coverage.   The charges it imposes on borrowers, which Selene attributes to the cost of the insurance, are not only greater than its actual cost of providing the insurance and the actual cost paid by Selene, but also are usually greater than the premiums for the borrowers' voluntary insurance, even though the force-placed insurance provides less coverage.  Through this manipulation of the force-placed insurance selection process, Selene maximizes its own profits and those of its co-Defendants to the detriment of Plaintiffs and the

8

Class members.

### The Force-Placed Insurance Industry

27.     Lenders and mortgage servicers, like Selene here, force-place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to force-place coverage on the property to protect its interest in the loan and to charge the borrower the cost of coverage.

28.     Force-placed insurance schemes like the one at issue here take advantage of the discretion afforded to the Selene in standard form mortgage agreements.  The mortgage agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

29.     These schemes also violate the mortgage contract's express terms.  The borrower contracts to compensate the lender for the actual cost that the lender or servicer pays the insurer for the forced coverage, but is then charged an amount that is more than the lender or servicer actually paid.  Typically, lenders delegate to servicers the lenders' rights to enforce the terms of the mortgage contract.

30.     Force-placed insurance providers enter into exclusive relationships with servicers to provide the master policies.  To maintain their exclusive relationships with these servicers, the force-placed insurers, like Great American, using an insurance agency like Southwest as a conduit, pay unearned kickbacks, often calculated as a percentage of the force-placed premiums and disguised as "commissions" or "expense reimbursements"; together with Southwest, offer

9

subsidized mortgage servicing functions; enter into lucrative captive reinsurance deals with them; and/or provide other financial benefits not attributable to the cost of insuring the property.

31.     The money to finance these force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for force-placed insurance by lenders or servicers.  Borrowers are required to pay the full amount that the lender or servicer initially pays to the insurer despite the fact that a considerable portion of that amount is kicked back to the lender or servicer in the manner described above.  Selene gets the benefit of an effective rebate from Great American that it does not pass on to the borrower.  Instead it charges the borrower the full amount, purportedly for the cost of insurance coverage.  Selene reaps these unconscionable profits entirely at the expense of the unsuspecting borrowers.

32.     During a 2012 hearing on force-placed insurance at the National Association of Insurance Commissioners ("NAIC"), Mr. Birny Birnbaum, an expert on the force-placed insurance market, illustrated the staggering growth in profits that force-placed insurance schemes have reaped in recent years:[1]

---

[1] This graph and the ones that follower are from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:http://www.naic.org/documents/committees_c_120809-public_hearing_lender_placed-insurancepresentation_birnbaum.pdf.

1041151

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004–2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                13                August 9, 2012

## FACTUAL ALLEGATIONS

33.     The standard form mortgage agreements for loans serviced by Selene include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan.  In the event that the insurance lapses, the standard form mortgage agreements permit Selene to obtain force-placed coverage to protect the its interest in the loan and to charge the cost of the insurance to the borrower rather than declare the borrower in default.

34.     What is unknown to borrowers, and not disclosed in the standard form mortgage agreements, is that Selene has exclusive arrangements with Southwest and Great American to manipulate the force-placed insurance market and receive kickbacks that provide it an effective rebate on the cost of the insurance that it does not pass on to Plaintiffs and the Class members. Defendants disguise these kickbacks as "commissions," "expense reimbursements," or reinsurance premiums.  The amounts may also include other unmerited charges in the form of direct payments

11

and provide additional financial benefits in the form of below-cost mortgage servicing functions to Selene that are not attributable to the cost of insuring the individual property.

### Defendants' Force-Placed Insurance Scheme

35.     Great American and Southwest have exclusive arrangements with Selene to monitor Selene's mortgage portfolios, perform various mortgage servicing functions (obligations properly borne by Selene), and provide force-placed insurance coverage.  In addition to the subsidized mortgage services it receives, as set forth in detail below, Selene is "kicked back" a percentage of the force-placed charges.

36.     The scheme works as follows:  Selene purchases a master insurance policy from Great American that covers the entire Selene portfolio of mortgage loans.  In exchange, Great American is given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's voluntary insurance lapses or the lender determines the borrower's existing insurance is inadequate.

37.     Southwest and/or Great American monitor Selene's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, they send a cycle of letters, reviewed and approved by Selene, to the borrower in Selene's name, stating that Selene will purchase insurance for the property, for which the borrowers will be financially responsible, and force-place it on the property.  In reality, however, the master policy is already in place and Selene does not seek out and purchase a new policy on the individual borrower's behalf.  Rather, a certificate of insurance from the master policy is automatically issued by Southwest and Great American and Selene is charged for that certificate.

38.     The letters or notices sent to borrowers are generated and sent at predetermined intervals by an automated system used by Great American and Southwest.  The letters indicate an

address for borrowers to submit proof of insurance or correspondence to Selene; however, the address is actually for a Great American or Southwest location because they are performing these services for Selene.  Each borrower is subject to Defendants' automated system and receives materially the same letters described above.

39.     Once a certificate is issued pursuant to the pre-existing master policy, coverage is forced on the property, and Selene charges the borrower an amount they attribute to the "cost" of the force-placed insurance, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[2]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

40.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and Selene charges the borrowers the pre-rebate amounts that include the kickbacks.

41.     To fund the force-placed insurance scheme, Selene pays for the certificate of insurance, which issues from the already-existing master policy.  Selene, not the borrower, is obligated to pay Great American for the force-placed insurance pursuant to the agreements between Defendants (to which borrowers are not party), which govern the mortgage servicing functions that Great American and Southwest perform as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

42.     Once coverage has issued and Selene has paid for the insurance, Great American kicks back a set percentage of the premium to Selene as a "commission" or an "expense reimbursement."  The money paid back to Selene or its affiliates is not given in exchange for any

---

[2]  On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, Great American or Southwest may disclose in the form letters to the borrower that Selene may earn "commissions" as a result of the forced placement of new coverage, or that Selene incurred "costs" as a result of the force-placement of insurance, or that a "fee" is due to an agency.

43.     These payments are not compensation for work performed; they are an effective rebate on the premium amount owed by Selene, reducing the cost of coverage that Selene pays to Great American.   The "commissions" or "expense reimbursements"  are  not  legitimate reimbursements for actual costs, nor are they payments that have been earned for any work done by Selene or an affiliate related to the placement of the insurance; they are unlawful kickbacks to Selene for the exclusive arrangement to force-place insurance

44.     In reality, no work is ever done by Selene to procure insurance for a particular borrower because the coverage comes through the master policy already in place and the procedures, including the issuance of the certificate of insurance, are automated.  Selene does not seek out insurance policies on borrower's behalf and has no involvement in the placing of the insurance.  As a result, the amount paid is not a true "commission," no income is "earned," and Selene does not incur any "expenses" in relation to the force-placement of insurance for any particular borrower.

45.     In addition to these direct payment kickbacks, Selene also enters into exclusive agreements whereby Great American and Southwest, provide mortgage servicing functions on Selene's entire loan portfolio at below cost.  These functions, which include, but are not limited to, activities such as "new loan boarding," "escrow administration," "customer service," and "loss draft services," are often not related to the provision of force-placed insurance and are performed

14

at below cost as a way to keep the exclusive arrangement in place. Indeed, Great American does not perform these services for a lender or servicer without also being the exclusive provider of force-placed insurance. Southwest does not perform these services for a lender or servicer without also being the exclusive vendor for the procurement of force-placed insurance.

46.     Upon information and belief, Southwest and Great American are able to perform many of the mortgage servicing functions for Selene at below-cost because of the funds received from the force-placed insurance charges which subsidize any expenses incurred for performing the services.

47.     The borrower ultimately subsidizes the below-cost mortgage servicing through the charges for forced coverage imposed by Selene. However, because insurance-lapsed mortgaged property generally comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers, like Plaintiffs here, who are charged for the force-placed insurance unfairly bear the cost to service and monitor the entire Selene loan portfolio. These charges, passed on to Plaintiffs and the proposed classes, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans, often have nothing to do with the provision of force-placed insurance, and Selene is already compensated for these activities by the owners of the loans (e.g. Fannie Mae).

48.     Thus, the small percentage of borrowers who are charged for force-placed insurance subsidize the costs of servicing Selene's entire loan portfolio, effectively resulting in a kickback to Selene to keep its exclusive arrangement in place with Southwest and Great American.

49.     In addition, upon information and belief, Great American enters into essentially riskless "captive reinsurance arrangements" with Selene or its affiliates, to "reinsure" the property insurance force-placed on borrowers. An *American Banker* article illustrated this reinsurance

15

problem using JPMorgan Chase's program with Assurant, Inc. by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements.
>
> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS[.]
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.
>
> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

50.    Selene's reinsurance program, like those of other servicers, is simply a way to funnel profits from the force-placed scheme, in the form of ceded premiums, to Selene at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  Selene and/or its affiliates enter into reinsurance agreements with Great American that provide that the insurer will return to Selene significant percentages of the premiums charged to borrowers by way of ceded reinsurance premiums to Selene affiliates – which in turn provide these premiums to Selene often in the form of "soft-dollar" or other credits.  The ceded premiums are

16

nothing more than a kickback and a method for Selene to profit from the forced placement of new coverage. Indeed, while Selene's affiliates purportedly provided reinsurance, they did not assume any real risk.

51.     Borrowers are also charged interest on the amounts owed for force-placed coverage, which is calculated based on the pre-rebate amount, i.e. based on an amount greater than Selene's actual cost of coverage. When Selene adds the cost of the high-price force-placed insurance to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

52.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize Defendants' profits at the expense of Plaintiffs and the other Class members. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property, are charged illegitimate noncompetitive amounts for force-placed insurance that include rebates to Selene not passed on to borrowers. These charges cover undisclosed kickbacks to Selene or its affiliates (who, as described above, perform little, if any, work related to the forced placement of the individual policies), as well as the cost of captive reinsurance arrangements, and the provision of below-cost mortgage servicing functions.

53.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies and have no ability to seek out and purchase their own force-placed insurance policy. Force-placed policies are commercial insurance policies intended to be sold to lenders and servicers and their terms are determined by the lender/servicer, here, Selene and the FPI providers, here, Great American. Borrowers have no ability to seek out and purchase a force-placed policy on their own nor do they have any recourse to challenge the illegitimate charges with any State insurance regulator. It is Selene and not the borrower that is the

17

Named Insured on the force-placed policies.

54.     Plaintiffs do not challenge Selene's right to force place insurance in the first instance.  They challenge the discretion afforded mortgage lenders and servicers in purchasing force-placed insurance, as well as Defendants' manipulation of the force-placed insurance market whereby Great American and Southwest provide kickbacks to Selene to keep the exclusive arrangement in place.  These kickbacks provide an effective rebate to Selene on the purchase of the force-placed insurance that Selene does not pass on to the borrower.  Servicers, like Selene, are financially motivated to select the insurer, like Great American, that offers it the best financial benefit in the terms of "commissions," "expense reimbursements," direct payments, discounted mortgage servicing, or debt forgiveness.

55.     This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage paid by Selene.  Plaintiffs seek to recover the improper charges passed on to them and other Selene borrowers nationwide through their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), the New Jersey Consumer Fraud Act "NJCFA"), the federal Truth in Lending Act ("TILA"), and the federal Racketeering Influenced and Corrupt Organizations Act ("RICO").

**Government and Regulatory Scrutiny of the Force-Placed Industry**

56.     It is no surprise that these practices have come under increased scrutiny in recent years by the government and regulators:

- At hearings before the New York Department of Financial Services ("NYDFS") on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the

Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- In 2013, as a result of its investigation, the NYDFS entered into Consent Order with certain FPI providers that acknowledged that the "commissions" are unearned, noting, in relevant part:

> Commissions paid to affiliates are a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-place insurance premium rates.  Commissions are paid to affiliates of servicers because they are a cost of staying in the market, not for any particular work the affiliates perform.

- The National Association of Insurance Commissioners (NAIC) has expressed concern with the "reverse competition" at play in the force-placed insurance market whereby the insurers compete by offering mortgage lenders and servicers a share in the profits, rather than by offering lower prices.  On its website, the NAIC states:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obliged to pay the cost of the coverage.  Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lower price for coverage since the cost is born by the borrower.  Normally competitive forces tend to drive down costs for consumers.  However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

*See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm

- The Consumer Financial Protection Bureau's new regulations on force-

19

placed insurance became final on January 17, 2013 and prohibit servicers of federally regulated mortgage loans from force-placing insurance unless the servicer has a reasonable basis to the believe the borrower's insurance has lapsed and require the servicer to provide three notices of the force-placement in advance of issuing the certificate of insurance.[3]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[4]

- On May 6, 2016, American Modern entered into a Consent Order with the State of Minnesota Commissioner of Commerce, which included numerous pertinent findings of fact, including that American Modern:

  o Paid commissions to servicer-affiliated agencies in connection with its force placed products;
  o Paid commissions to insurance producers that are affiliates of Servicers;
  o Paid commissions to insurance producers that are not affiliates of Servicers;
  o Made other payments or discounts to servicers and their affiliates in connection with its force-placed products;
  o Entered into agreements with servicers and their affiliates that provided for the payment of compensation.

57.    Selene, Southwest, and Great American operate their force-placed scheme in the same manner as found in the cases above.  Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed classes they seek to represent.   This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced

---

[3] *See* Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers" available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/

[4] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

1041151

placement of insurance by the Defendants.

### Plaintiff Lillian Marshall

58.     Ms. Marshall took a mortgage loan from ACT Lending Corporation in January,

2006, secured by a mortgage on real property at 309 Hamilton Street, Rahway, New Jersey 07065.

At all times relevant to the allegations herein, Ms. Marshall's mortgage loan was owned and/or

serviced by Selene.

59.     Ms. Marshall's mortgage provides as follows:

> 5. **Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.
>
> &ast; &ast; &ast; &ast;
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.
>
> &ast; &ast; &ast; &ast;
>
> 9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]
>
> &ast; &ast; &ast; &ast;

21

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Ms. Marshall's mortgage agreement is attached as **Exhibit A**.

60. Pursuant to the automated procedures in place, letters purporting to come from Selene were sent to Ms. Marshall informing her that Selene would purchase lender placed hazard coverage on her property with an effective date of July 21, 2015. The letters stated that insurance "[m]ay cost $1,004.64 annually…."

61. The letters did not disclose any aspect of the secret and illegal compensation arrangement entered into by Great American, Southwest, and Selene, or inform Ms. Marshall that she would be charged illegitimate amounts beyond what Selene actually paid for the cost of coverage. Nor did the letters disclose to Ms. Marshall that the amounts being charged to her would be inflated to subsidize the cost of Southwest or Great American performing mortgage servicing functions for Selene that have little or nothing to do with the provision of the force-placed insurance.

62. The communications to Ms. Marshall were false and misleading. Selene represented in the letters that it was charging her the amounts paid for the "cost" of the insurance. However, the charges imposed on Ms. Marshall did not reflect Selene's true cost of coverage because Selene was receiving an effective rebate on the force-placed insurance through the kickback scheme described above. Selene, therefore, paid less for coverage than it represented to and charged Ms. Marshall and the Class members.

63. The communications to Ms. Marshall were also misleading in that they represented that Selene "purchased" the individual insurance for Ms. Marshall's property when an exclusive

22

arrangement and master policy was already in place with Great American, and Selene did not in fact, perform any additional work to procure coverage for Ms. Marshall's property.

64.     It was never disclosed to Ms. Marshall or the putative Class members that because of Selene's kickback scheme, Selene would be receiving a rebate and effectively be paying less for the force-placed insurance coverage than it would charge Ms. Marshall and the putative class. Nor was it disclosed to Ms. Marshall or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage servicing functions not properly charged to them.

65.     Letters containing the misrepresentations and omissions described above were sent to Ms. Marshall on October 10, 2015, January 9, 2016, and May 19, 2016.

66.     Ms. Marshall either paid or still owes the charges for the force-placed insurance.

67.     There were no material differences between Selene's actions and practices directed to Ms. Marshall and its actions and practices directed to the Class.

**Plaintiff Robin McNeil**

68.     Plaintiff McNeil took a mortgage loan from Premium Capital Funding, LLC in 2009 on a property in Osceola County, Florida.  At all relevant times, the mortgage loan was serviced by Selene.

69.     Ms. McNeil mortgage provides as follows:

> **4.  Fire, Flood and Other Hazard Insurance**. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which the Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure al improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by the Lender. The insurance policies and any renewals shall be held by Lender and shall include

loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.
…

**7. Charges to Borrower and Protection of Lender's Rights in the Property**. Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this

Security Instrument unless Borrower: (a) agrees in writing to payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any party of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice

Ms. McNeil's mortgage agreement is attached as **Exhibit B**.

70.     Pursuant to the automated procedures in place, letters purporting to come from Selene were sent to Ms. McNeil informing her that Selene would purchase lender placed hazard coverage on her property with an effective date of August 1, 2015.  One such letter was sent to Ms. McNeil on January 22, 2016 and stated that insurance "costs $1,759.08 annually."

71.     The letters did not disclose any aspect of the secret and illegal compensation arrangement entered into by Great American, Southwest, and Selene, or inform Ms. McNeil that she would be charged illegitimate amounts beyond what Selene actually paid for the cost of coverage.  Nor did the letters disclose to Ms. McNeil that the amounts being charged to her would be inflated to subsidize the cost of Southwest or Great American performing mortgage servicing functions for Selene that have little or nothing to do with the provision of the force-placed insurance.

72.     The communications to Ms. McNeil were false and misleading.  Selene represented in the letters that it was charging her the amounts paid for the "cost" of the insurance.  However, the charges imposed on Ms. McNeil did not reflect Selene's true cost of coverage because Selene was receiving an effective rebate on the force-placed insurance through the kickback scheme described above.  Selene, therefore, paid less for coverage than it represented to and charged Ms.

25

McNeil and the Class members.

73.     The communications to Ms. McNeil were also misleading in that they represented that Selene "purchased" the individual insurance for Ms. McNeil's property when an exclusive arrangement and master policy was already in place with Great American, and Selene did not in fact, perform any additional work to procure coverage for Ms. McNeil's property.

74.     It was never disclosed to Ms. McNeil or the putative Class members that because of Selene's kickback scheme, Selene would be receiving a rebate and effectively be paying less for the force-placed insurance coverage than it would charge Ms. McNeil and the putative class. Nor was it disclosed to Ms. McNeil or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage servicing functions not properly charged to them.

75.     One such letter containing the misrepresentations and omissions described above was sent to Ms. McNeil on January 22, 2016.

76.     Ms. McNeil either paid or still owes the charges for the force-placed insurance.

77.     There were no material differences between Selene's actions and practices directed to Ms. McNeil and its actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.  Class Definitions

78.     Plaintiffs bring this action against Selene pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  Plaintiffs seek to represent the following three classes:

1041151

### (1) **Nationwide class:**

All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard or flood insurance policy through Selene or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

### (2) **New Jersey Subclass with Ms. Marshall as the Class Representative:**

All New Jersey borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through Selene or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

### (3) **Florida Subclass with Ms. McNeil as the Class Representative:**

All Florida borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard or flood insurance policy through Selene or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees

79. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

80. Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B. **Numerosity**

81. The proposed classes are so numerous that joinder of all members would be impracticable. Defendants sells and services hundreds of thousands of mortgage loans and insurance policies in the States of New Jersey, Florida, and nationwide. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Defendants. The precise number of Class members number

27

at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

### C. **Commonality**

82.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims. These common questions predominate over any questions that go particularly to any individual member of the Classes. Among such common questions of law and fact are the following:

> a.  Whether Selene breached its mortgage contracts with Plaintiffs and the Class by selecting force-placed insurance policies that would allow for the payment of illegal kickbacks (in the form of unwarranted commissions, expense reimbursements, below-cost mortgage servicing, or reinsurance payments) and by charging Plaintiffs and the Class members more than the actual cost of coverage;

> b.  Whether Selene breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated amounts being charged to Plaintiffs and the Class members;

> c.  Whether Selene manipulated the force-placed insurance procurement process in order to maximize its profits to the detriment of Plaintiffs and the Class members;

> d.  Whether Selene or its affiliates performed any work or services in exchange for the "commissions" or other forms of kickbacks it collected;

> e.  Whether the "expense reimbursements" received by Selene are for true expenses or are just kickbacks pursuant to their exclusive relationship with Southwest and Great American;

> f. Whether Selene's charges are inflated to compensate for mortgage servicing activities that Southwest and Great American and their affiliates provide to Selene, and which are not chargeable to Plaintiffs and the Class members under

28

1041151

the terms of their mortgages;

g. Whether the charges are inflated to include the cost of an unlawful captive reinsurance arrangement;

h.      Whether Selene employed an unconscionable commercial practice, misrepresentation, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with content that others rely upon such concealment, suppression or omission by their arrangement, which incentivizes Selene to charge inflated and unnecessary fees for force-placed insurance, and therefore violates the New Jersey Consumer Fraud Act;

i. Whether an objective consumer would be deceived by Selene's force-placed insurance arrangement, whereby Selene pays a reduced amount for force-placed insurance but charges its borrowers an inflated amount to cover the kickbacks it receives while representing that it is only charging the cost of insurance coverage, and therefore violates FDUTPA;

j.    Whether there was actually a transfer of risk under Defendants' purported reinsurance arrangement;

k.    Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class;

l. Whether Selene violated TILA by failing to disclose kickbacks charged to Plaintiffs and the Class members in their mortgages;

m. Whether Great American and Southwest intentionally and unjustifiably interfered with Plaintiffs' and the Class members' rights under the mortgage contracts by paying kickbacks and providing free or below-cost mortgage servicing functions to Selene or its affiliates thereby inducing a breach of the contract;

n. Whether Defendants were associated with the enterprise and agreed and conspired to violate the federal RICO statutes; and

o. Whether Plaintiffs and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.  Typicality**

83.      Plaintiffs are members of the Classes they seek to represent.  Plaintiffs' claims are

typical of the respective classes' claims because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct.   Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

### E.  Adequacy of Representation

84.     Plaintiffs are adequate representatives of the Classes they seek to represent and will fairly and adequately protect the interests of the Classes.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a Class action.

85.     To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F.  Requirements of Fed. R. Civ. P. 23(b)(3)

86.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.   All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance policies that Selene unlawfully imposed and its deceptive and egregious actions involved in imposing the charges for the force-placed policies.

87.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

88.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

### G. **Superiority**

89.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside all across the country;

(b) Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.  As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

### H. **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

90.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

91.     Selene has acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

**COUNT I**

**BREACH OF CONTRACT**

92.     Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein

31

and further alleges as follows.

93.     Plaintiffs and all similarly situated Class members have mortgages that were owned and/or serviced by Selene.

94.     Plaintiffs' and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by Selene.  The force-placed provisions from Plaintiffs' mortgages are set forth above and true and correct copies of the mortgage agreements are attached to this complaint as **Exhibit A** and **Exhibit B**.

95.     Plaintiffs' mortgages require that they maintain insurance on their property and provide that if they should fail to do so, the lender or servicer might obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the "cost of the insurance coverage."  Plaintiffs' mortgages further provide that the lender may do and pay for whatever is reasonable or appropriate to protect its interest in the property and rights under the mortgage agreement, including protecting and/or assessing the value of the property and securing and/or repairing the property.

96.     Selene charges borrowers more for force-placed insurance than it actually pays for coverage because the charges include unearned "commissions" or "expense reimbursements" and other kickbacks, as well as subsidies for below-cost mortgage servicing functions that have little or nothing to do with the placement of force-placed insurance.  These costs are not costs of coverage, and are not applied to protecting Selene's rights or risk in the collateral for borrowers' mortgage loans.  They are simply bribes to keep the exclusive relationship in place.

97.     Through the kickbacks it receives, Selene pays less for force-placed coverage than it charges to Plaintiffs and other Class members.

32

98.     Selene breached the mortgage agreements by, among other things, charging Plaintiffs and absent class members the amounts beyond the actual cost of coverage and more than what it actually paid for the FPI, and more than what was reasonable or appropriate to protect its interest in the property.

99.     Plaintiffs and the Class members have suffered damages as a result of Selene's breach of contract.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from Selene's breach of contract, as well as injunctive relief preventing it from further violating the terms of the mortgages.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

100.     Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein and further allege as follows.

101.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

102.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

103.     Plaintiffs' and the Class members' mortgage contracts allow Selene to force-place insurance coverage on borrowers in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

33

104.     Selene was afforded substantial discretion in force-placing insurance coverage.   It was permitted to unilaterally choose the company from which it purchased force-placed insurance and negotiate the price of the coverage it procured without restriction.  Selene had an obligation to exercise its discretion in good faith, and not capriciously or in bad faith.

105.     The purpose of the mortgage clause allowing a servicer, like Selene, to force place insurance is to protect the servicer's interest in the property that is collateral for the mortgage loan. Selene breached the implied covenant of good faith and fair dealing by making additional profits at Plaintiffs' expense through force-placing insurance on the property and receiving kickbacks on that insurance that bore no relation to protecting its interest in the property.

106.     Selene further breached the implied covenant of good faith and fair dealing by, among other things:

> (a) Manipulating the force-placed insurance market by selecting insurers that will allow for the payment of gratuitous kickbacks to Selene;
>
> (b) Exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting insurers and master policies that allow for the payment of kickbacks to Selene;
>
> (c) Assessing charges unrelated to insurance coverage against Plaintiffs and the Classes which Selene attributes to the cost of the insurance coverage;
>
> (d)  Receiving an effective rebate on the force-placed insurance through the kickback scheme but not passing on that rebate to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;
>
> (e) Charging Plaintiffs and the Classes for "commissions" or "expense reimbursements" when the insurance is prearranged and no commission is earned or due and no expenses are incurred in placing the certificate of insurance;
>
> (f)  Charging Plaintiffs and the Classes the cost of having Southwest and Great American perform its obligation of servicing its entire mortgage portfolio, which is not properly chargeable to Plaintiffs or the Classes;

34

(g) Force-placing insurance coverage that is duplicative of existing coverage, or in excess of what is required by borrowers' mortgage agreements;

(h) Seeking out an force-placed insurance insurer that will provide it the best deal in terms kickbacks and below-cost mortgage servicing functions with the knowledge that these functions will be subsidized by the amounts paid for force-placed insurance;

(i) Force-placing insurance coverage in excess of that required to cover the lender's interest in the property; and

(j) Charging Plaintiffs and the Classes an inflated charge for the force-placed insurance due to the captive reinsurance arrangement.

107.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class members have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek a judicial declaration that Selene's conduct described above and the amounts charged to borrowers are in contravention of its duties of good faith and fair dealing.  Plaintiffs also seek compensatory damages resulting from Selene's breaches of its duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (Plaintiff Marshall on behalf of the New Jersey Subclass)

108.    Plaintiff Marshall re-alleges and incorporates paragraphs 1-77 above as if fully set forth herein and further alleges as follows.

109.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid,

35

whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

110.    Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  Selene has an exclusive relationship with Southwest and Great American, whereby it would pay for high-priced force-placed insurance, charge that amount to Plaintiffs and the New Jersey Subclass, and receive a rebate on the charge through "commissions," "expense reimbursements," or captive reinsurance arrangements based on a percentage of the insurance policy's premium.

111.    Southwest has a relationship with Selene, whereby it acts as an agent for Great American and Selene in carrying out the scheme to incentivize Selene to select Great American force-placed insurance policies with unreasonable and inflated premiums, knowing that Selene imposes charges upon Plaintiff and the New Jersey Subclass in amounts equal to the inflated premium amounts.

112.    Great American had a relationship with Selene, whereby Great American incentivized Selene to select Great American's force-placed insurance policies with unreasonable and inflated premiums with knowledge that the full premium amount would be charged by Selene to Plaintiffs and the New Jersey Subclass.  As compensation, Great American would kick back a set percentage of the force-placed charge to Selene or its affiliates as a commission or an expense reimbursement or enter into captive reinsurance agreements with Selene affiliates as a means to funnel financial benefits to them.

113.    Selene further received below-cost mortgage servicing functions from Southwest

36

and Great American as an incentive to maintain the exclusive relationship.

114.    Defendants made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Ms. Marshall and the New Jersey Subclass.  Great American and Southwest, with the approval of Selene, sent form letters to Plaintiff Marshall on Selene letterhead, stating that Selene would purchase force-placed coverage if voluntary insurance was not secured.  Selene represented in the letters that Plaintiff would be charged the "cost" of the insurance. In making this statement, Defendants misrepresented to Plaintiff Marshall and the New Jersey Subclass that the amounts charged represented the "cost" of the policies.  In fact, the amounts charged to borrowers were not the cost that Selene paid for the insurance because Selene received a rebate on the price through the kickbacks, reinsurance scheme, and other wrongful benefits Great American and Southwest provided to Selene or its affiliates.  Letters containing these misrepresentations, and false pretenses were sent to Plaintiff Marshall on October 10, 2015, January 9, 2016, May 19, 2016.

115.    Further, the policy that was "purchased" according to these letters, was actually already in place on the date of lapse according to the agreement between Great American, Southwest, and Selene.

116.    Selene and Great American engaged in unconscionable commercial practices when they paid and accepted kickbacks.  A New Jersey statute expressly bans their conduct in accepting paying and receiving the kickbacks identified in this lawsuit.  It states:

> no insurer . . . shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy of insurance, except to the extent that such rebate, discount, abatement, credit, reduction, favor, advantage, or consideration may be

37

provided for in rating–systems filed by or on behalf of such insurer and approved by the commissioner.  *No insured named in a policy of insurance . . . shall knowingly receive or accept, directly or indirectly, any such rebate, discount, abatement, or reduction of premium, or any such special favor or advantage or valuable consideration or inducement.*

N.J.S.A. 17:29A-15 (italics supplied).

117.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction.  N.J.S.A. 56:9-19.

118.    Plaintiff Marshall and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

119.    Plaintiff and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of Defendants' unconscionable practices. Selene had an exclusive relationship with Great American and Southwest, whereby Great American would charge Selene for high-priced, inflated amounts for force-placed insurance, placed through Southwest, the full cost of which Great American and Southwest knew would be charged to Plaintiff and the New Jersey Subclass.  As compensation, Great American would kick back a set percentage of the inflated premiums to Selene as a commission or an expense reimbursement or enter into captive reinsurance agreements with Selene or its affiliate as a means to funnel financial benefits to Selene.  Upon information and belief funds were also passed to Southwest to subsidize the below-cost mortgage servicing functions it performs on behalf of Selene.

120.    Pursuant to the terms of the standard form mortgage agreements used by Selene, Selene would charge Ms. Marshall and New Jersey Subclass's escrow accounts for the insurance coverage. However, Selene charged Plaintiff and the New Jersey Subclass more than it paid for

38

the insurance coverage because the insurance charge was improperly inflated by the kickbacks, reinsurance profits, and other wrongful benefits conveyed to Selene that provided it an effective rebate on the cost.

121.    Plaintiff Marshall and the New Jersey Subclass have a private right of action against Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person of interest, as well as an award reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

122.    Plaintiff Marshall and the New Jersey Subclass have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE**, Plaintiff Marshall, on behalf of herself and the New Jersey Subclass, demands judgment against Defendants for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT IV

### VIOLATION OF THE FLORIDA DECEPTIVE
### AND UNFAIR TRADE PRACTICES ACT
### (Plaintiff McNeil on behalf of the Florida Subclass against Selene)

123.    Plaintiff McNeil re-alleges and incorporates paragraphs 1-77 above as if fully set forth herein and further alleges as follows.

124.    FDUTPA, section 501.201, *et seq.*, Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

125.    Plaintiff McNeil and the Florida Subclass are "consumers" as that term is defined

39

1041151

in section 501.203(7), Florida Statutes.

126.   Selene has engaged in, and continues to engage in, unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

127.   The policies, acts, and practices alleged herein were intended to result and did result in the payment of illegitimate charges for force-placed insurance by Plaintiff McNeil and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for Selene.

128.   Specifically, Selene had an exclusive relationship with Southwest and Great American, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiff and the Florida Subclass, and then receive compensation through kickbacks, discounted mortgage services, or captive reinsurance arrangements that resulted in an effective rebate for Selene that was never passed on to Plaintiff and the Florida Class members.

129.   Selene's conduct of charging inflated amounts for the force-placed coverage to Plaintiff McNeil and members of the Florida Subclass violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

130.   Selene is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, it is not a bank or savings and loan association regulated by federal agencies.

131.   Plaintiff McNeil and the Florida Subclass have sustained actual damages in the form of as a direct and proximate result of Selene's unfair and unconscionable practices.  Section

501.211(2), Florida Statutes, provides Plaintiff and the Florida Subclass a private right of action against these Defendants and entitles them to recover their actual damages, plus attorneys' fees and costs.

132.    Plaintiff and the Florida Subclass have suffered and will continue to suffer irreparable harm if Selene continues to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff McNeil, on behalf of herself and the Florida Subclass, demands judgment against Selene for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT V

## UNJUST ENRICHMENT[5]
### (against Selene)

133.    Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein and further allege as follows.

134.    Selene receives a rebate on the cost of the force-placed insurance coverage but does not pass that rebate on to its borrowers.  The rebates are provided to Selene in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and free or below-cost mortgage servicing functions.  These benefits to Selene are paid through the amounts charged to Plaintiffs and the Class members for force-placed insurance.

---

[5] Plaintiffs pleads their unjust enrichment claim against Selene in the alternative to their contractual claims against it.

135.     Selene entered into an agreement whereby the insurance vendors – Great American and Southwest – would provide below cost mortgage servicing activities and cover Selene's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed.  Selene would then charge Plaintiffs and the Class amounts for the force-placed insurance that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself.  The force-placed policies imposed on borrowers therefore cost less than what Selene had actually paid for them.

136.     Commissions or kickbacks were paid directly to Selene or its affiliates in order to be able to exclusively provide force-placed insurance policies.  Great American, and Southwest were mere conduits for the delivery of the kickbacks and improper rebates to Selene or its affiliates.

137.     These payments directly benefitted Selene and were taken to the detriment of the borrower.  The kickbacks (in the form of expense reimbursements, commissions, or reinsurance arrangements, as well as subsidized mortgage servicing functions) were subsumed into the charges to borrowers for the force-placed insurance and ultimately paid by them.  Therefore, Selene had the incentive to seek out unreasonably inflated prices for the force-placed insurance and charge the inflated amounts to borrowers.

138.     Further, Selene was unjustly enriched through financial benefits in the form of increased interest income when the amounts for the force-placed insurance policies were added to the Class members' mortgage loans.

139.     As a result, Plaintiffs and the Class members have conferred a benefit on Selene.

140.     Selene had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

141.     Had Plaintiffs known the true facts behind Selene's force-placed insurance scheme,

42

that the charges from Selene to them included the kickbacks described above, and that Selene was receiving an effective rebate on the charges but not passing on that rebate to them, they would have expected remuneration from Selene.

142.    Selene will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Selene was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against Selene in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT VI

### VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
**(against Selene)**

143.    Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein and further allege as follows.

144.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

145.    Selene is a "creditor" as defined by TILA because it owned or serviced Plaintiffs' mortgages and changed the terms of the mortgage so as to create a new mortgage obligation, of which Selene was the creditor.

146.    Pursuant to TILA, Selene was required to accurately and fully disclose the terms of

43

the legal obligations between the parties.  *See* 12 C.F.R. § 226.17(c).

147.    Selene violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan servicing, and/or other profiteering involving Selene and/or its affiliates as a result of the purchase of force-placed insurance.

148.    When Selene changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation.  Under TILA, Selene was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof.   On information and belief, to the extent a borrower cannot pay the expense up front, Selene increases the principal amount under Plaintiffs' and Class Member's mortgages when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

149.    Selene adversely changed the terms of Plaintiffs' loans after origination in order to allow a kickback on the force-placed insurance charges.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  Selene never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to it or its affiliate.

150.    Selene also violated TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

151.    Acts constituting violations of TILA occurred within one year prior to the filing of

44

the original Complaint in this action, or are subject to equitable tolling because Selene's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

152.    Plaintiffs and Class members have been injured and have suffered a monetary loss arising from Selene's violations of TILA.

153.    As a result of Selene's TILA violations, Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Selene's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

154.    Plaintiffs and Class members are also entitled to recovery of attorneys' fees and costs to be paid by Selene, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Selene awarding actual damages and a penalty of $500,000.00 or 1% of Selene's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by Selene, as provided by 15 U.S.C. § 1640(a)(3).

<u>**COUNT VII**</u>

<u>**VIOLATION OF RICO, 18 U.S.C. § 1962(c)**</u>

155.    Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein and further allege as follows.

156.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

157.    The RICO enterprise which engaged in and the activities of which affected

interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Selene, Great American, Southwest and their affiliates.

158.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class members to pay amounts for force-placed insurance over the actual cost of the insurance to Selene, through a scheme that inflated such amounts to cover kickbacks and expenses associated with servicing Selene's entire loan portfolio, and concealing from Plaintiffs and Class members the true nature of those charges. Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

159.    The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

160.    Selene, Southwest, and Great American conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

161.    Selene, along with Southwest and Great American directed and controlled the enterprise as follows:

    a.    Selene, Great American, and Southwest specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which Selene agreed;

    b.    Great American, Southwest, and Selene drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from Selene.  The letters fraudulently misrepresented the true "cost" of the insurance forced on their properties, and these letters were approved by Selene prior to being mailed to class members;

c. Great American and Southwest ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking Selene's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that an agency would be paid a fee as compensation for securing an individual policy;

d. Selene received kickbacks and below-cost mortgage servicing functions from Southwest and Great American to maintain the exclusive relationship and keep their force-placed scheme moving forward;

e. by directing, controlling, and creating an enterprise and arrangement by which Selene would receive unearned kickbacks;

f. by directing, controlling, and creating an enterprise and arrangement by which Selene would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, reinsurance, expense reimbursements, or credits that were merely bribes to keep the exclusive relationship and not disclosing same to borrowers;

g. by directing, controlling, and creating an enterprise and program by which Selene received rebates on the cost of the insurance but never charged the borrowers its actual or effective cost to procure the lender placed policies;

h. by designing and directing an exclusive arrangement by which Selene manipulated the force-placed insurance market in order to artificially inflate the amounts it charge to borrowers for force-placed insurance. The charges were inflated to provide Selene with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted mortgage servicing, and/or to provide Selene with lucrative debt forgiveness or reinsurance payments. Great American and Southwest benefited by securing business from Selene—they provide kickbacks to Selene at the expense of the borrowers who are charged the inflated charges;

i. by developing and implementing guidelines and criteria to determine when force-placed insurance is placed on a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made and/or resulted in "double coverage;" and

j. by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

47

162.    In order to further its control and direction of the enterprise, Great American and Southwest paid bribes and kickbacks in the form of unearned commissions, direct payments, expense reimbursements, reinsurance payments, and below cost mortgage servicing.

163.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive Plaintiffs and Class members.

164.    For example, Great American and Southwest, with the approval of Selene, sent form letters to Plaintiffs on Selene letterhead through the U.S. Mail, stating that Selene would purchase force-placed coverage if voluntary insurance was not secured by a certain date. Specifically, to Plaintiffs, it was represented in the letters that Selene would "purchase" the required coverage that would cost Plaintiff Marshall $1004.64 and Plaintiff McNeil $1,759.08.  In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiffs were charged represented the actual "cost" of the policies, when in fact Selene paid less for the insurance due to the inclusion of the kickbacks and other costs paid as bribes to Selene that resulted in an effective rebate.  Defendants engaged in similar conduct as to all class members.

165.    Defendants also knowingly and intentionally fostered the mistaken impression that Selene was actively "obtaining" a policy for the borrower when in fact no work was done and no expenses were incurred by Selene or its affiliates because a master policy was already in place and the force-placed insurance was issued pursuant to the automated procedures in place.

166.    None of the letters sent to Plaintiffs disclosed the financial arrangement between the Defendants.

167.    Defendants had a duty to correct these misstatements and mistaken impressions. These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiffs unreasonably high amounts for force-placed insurance and were designed to lull Plaintiffs and the Class into believing that the charges were legitimate.

168.    Plaintiffs and other homeowners would not have paid, or would have contested these specific charges had Selene disclosed that the illegal bribes and kickbacks were included and that Selene was effectively paying less for the force-placed insurance than what it charged to Plaintiffs and the Class members.  Letters such as these were sent to Plaintiff Marshall on October 10, 2015, January 9, 2016, and May 19, 2016 and Plaintiff McNeil on January 22, 2016.

169.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they could charge Plaintiffs and Class members unreasonably high amounts for force-placed insurance.  This scheme to defraud proximately injured Plaintiffs and the Class because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property.  Had they known that the charges had been artificially inflated to include kickbacks and other improper charges and that they were paying more than what Selene ultimately paid, they would not have paid them or would have contested them.  Defendants also transferred sums among themselves, including but not limited to "fees," or "commissions" to Southwest to cover the below-cost mortgage servicing functions it provided in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

170.    By reason and as a result of Defendants' conduct and participation in the

49

racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiffs and Class members seek compensatory damages, treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VIII

### Violation of RICO, 18 U.S.C. § 1962(d)

171.    Plaintiffs re-allege and incorporate paragraphs 1-77 and 156-170 herein as if fully set forth herein.

172.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

173.    Selene, Southwest, and Great American illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

- Through Southwest, agreeing that Great American would be Selene's exclusive force-placed insurance providers and would extract unreasonably inflated amounts from Selene's customers.  Selene also agreed that Great American and Southwest would pay kickbacks to Selene and its affiliates;

- Agreeing that Southwest and Great American would administer the LPI program and monitor Selene's mortgage portfolios for lapses in voluntary insurance and would, with the approval of Selene, send misleading notices to borrowers.  These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be force-placed, the borrower would be charged the "cost" of the insurance";

- Entering into illusory commission, reinsurance, or outsourcing agreements in order to disguise the true nature of the amounts charged to borrower under the

50

guise of force-placed insurance; and

- Agreeing to commit two or more predicate acts as described above in Count VIII.

174. Through "soft-dollar" or other credits, or cash payments Selene affiliates pass profits from this scheme to Selene.

175. Selene committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

176. As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members suffered damages in the form of unreasonably high force-placed insurance charges.

**WHEREFORE,** Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## <u>COUNT IX</u>

### <u>TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP</u><br><u>(against Great American and Southwest)</u>

177. Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein and further allege as follows.

178. Plaintiffs and the Class members have advantageous business and contractual relationships with Selene pursuant to the mortgage contracts.   Plaintiffs and the Class members have legal rights under these mortgage contracts.   For example, Plaintiffs and the Class members have a right not to be charged exorbitant amounts attributed to force-placed insurance in bad faith.

179. Great American and Southwest had knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Classes and Selene. Great American and Southwest were not parties to the mortgage contracts, nor were they third-

51

party beneficiaries of the mortgage contracts.  Further, Great American and Southwest did not have any beneficial or economic interest in the mortgage contracts.

180.    Great American and Southwest intentionally and unjustifiably interfered with Plaintiffs' and the Classes' rights under the mortgage contracts, as described above, by, inter alia, entering into an exclusive relationship with Selene and/or its affiliates, whereby Southwest provided Selene with below-cost mortgage servicing functions and Great American provided kickbacks in the form of "commissions" or "expense reimbursements," or ceded reinsurance premiums, among other things, which are purposefully and knowingly charged to Plaintiffs and the Class members, to Selene in exchange for the exclusive right to be the force-place insurance provider.

181.    As a result of Great American's and Southwest's interference with the Plaintiffs' mortgage agreements, Defendant Selene breached the express and implied terms of its mortgage contracts with Plaintiffs and members of the Classes, by using funds that were designated to pay insurance, taxes, and other items, in order to pay non-designated costs of Defendants, including kickbacks, reinsurance premiums, and subsidized mortgage servicing functions (i.e. new loan boarding, loss drafts) that have no relation to the placement of force-placed insurance.

182.    Plaintiffs and the Classes have been damaged as a result of Great American's and Southwest's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges in connection with the force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Great American and Southwest for the actual damages suffered by them as a result of their tortious interference.  Plaintiffs also seek all costs of

litigating this action, including attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Selene as follows:

1) Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Classes sought in this complaint;

2) Enjoining Defendants from continuing the acts and practices described above;

3) Awarding damages sustained by Plaintiffs and the Class members as a result of Selene's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

4) Finding that Selene has been unjustly enriched and requiring it to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

5) Awarding Plaintiff Marshall and the New Jersey Subclass compensatory and treble damages, injunctive relief, declaratory relief, attorneys' fees, and costs under NJCFA;

6) Awarding Plaintiff McNeil and the Florida Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

7) Awarding damages sustained by Plaintiffs and the Class members as a result of the Great American's and Southwest's tortious interference with the mortgage agreement

8) Awarding Plaintiffs and Class members costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Classes' counsel and experts, and reimbursement of expenses;

1041151

9)      Awarding actual damages and a penalty of $500,000 or 1% of Selene's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3);

10)      Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

11)      Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Classes request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 6th day of July, 2016.

By: /s/ Robert J. Neary

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &<br>THROCKMORTON**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiffs* |

| | |
|---|---|
| Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* | Roosevelt N. Nesmith, Esq.<br>roosevelt@nesmithlaw.com<br>**LAW OFFICE OF**<br>**ROOSEVELT N. NESMITH, LLC**<br>363 Bloomfield Avenue, Suite 2C<br>Montclair, NJ 07042<br>Telephone: (973) 259-6990<br>Facsimile: (866) 848-1368<br>*Counsel for Plaintiffs* |

1041151